## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MediaMath Holdings, Inc., *et al.*,[1] | Case No. 23-10882 (LSS) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF NEIL NGUYEN IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Neil Nguyen, pursuant to 28 U.S.C. § 1746, and under penalty of perjury, declare

the following to the best of my knowledge, information and belief:

1.      I am the Chief Executive Officer of the above-captioned debtors and debtors

in possession (collectively, the "**Debtors**" or the "**Company**").  I am familiar with the Debtors'

business and financial affairs and assets and liabilities, having served in this role since January

2022.  In addition, I have served as a Board member of MediaMath, Inc. since April of 2021.  Prior

to joining the Debtors, I served as Chief Digital & Data Officer for Havas Edge, a global media

buying agency and oversaw the digital, analytics and programmatic buying groups.  Prior to that I

served as Chief Executive Officer and President at DG, Inc., a publicly traded content distribution

platform and digital media servicer to the advertising, entertainment, and broadcast industries, and

Sizmek, the second largest third-party digital advertising ad server, campaign management, and

distribution platform for advertisers, media agencies, and publishers.  I studied Business

Administration, emphasis in Finance & Real Estate, at California State University, Northridge and

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: MediaMath Holdings, Inc. (2425), MediaMath, Inc. (1297), MediaMath Ventures, LLC (4588), Adroit DS, LLC (0700), Searchlight MM Topco, L.P. (9412), Searchlight MM Topco GP, LLC (2453), and Searchlight MM Holdings, LLC (5372).  The Debtors' address is MediaMath, Inc., c/o Epiq Corporate Restructuring, LLC, P.O. Box 4420, Beaverton, Oregon 97076-4420.

have more than twenty (23) years' of senior leadership experience in the advertising technology and media industry.

2.      All facts set forth in this declaration (this "**Declaration**") are based on: (a) my personal knowledge; (b) my communications with members of the Debtors' Boards of Directors or Managers (collectively, the "**Board**"), management team, and the Debtors' consultants and professional advisors (collectively, "**Company Representatives**"); or (c) my opinions developed through my overall professional experience, personal knowledge of the Debtors' history, financial condition, and business operations and affairs.

3.      If called as a witness, I could and would testify competently to the matters set forth herein based on the foregoing.  My testimony is further based on my review of the Debtors' books and records and other relevant documents and information compiled and communicated to me by Company Representatives.  I am duly authorized to submit this Declaration on behalf of the Debtors.

4.      On June 30, 2023 (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "**Bankruptcy Code**").  The Debtors intend to continue in possession of their assets and the management of their business as debtors in possession during the pendency of these chapter 11 cases (collectively, the "**Chapter 11 Cases**").

5.      This Declaration is submitted: (a) to provide a brief overview of the Debtors and these Chapter 11 Cases; and (b) in support of the Debtors' chapter 11 petitions and "first day" motions and applications (collectively, the "**First Day Pleadings**"), which have been filed to minimize the adverse effects of the Debtors' filing for chapter 11 protection, and to enhance the

Debtors' ability to maximize value for the benefit of their estates and creditors through the chapter 11 process.

6.      This Declaration is organized into the following sections: *Section I* provides a brief overview of the Debtors' business and history; *Section II* summarizes the Debtors' equity ownership and capital structure; *Section III* describes the circumstances that led to the commencement of these Chapter 11 Cases, the Debtors' marketing and sale efforts, their efforts to obtain consensual use of cash collateral, and the Debtors' objective for these Chapter 11 Cases and the contemplated means by which that objective will be met; and finally *Section IV* provides the relevant facts in support of the First Day Pleadings and briefly summarizes the relief requested thereby.

7.      A chart detailing the organizational structure of the Debtors as of the Petition Date is attached hereto as <u>Exhibit 1</u> (the "**Org Chart**").

## I.      The Debtors' Business and Formation

8.      The Debtors are a global technology company that serves the digital advertising industry.  Founded in 2007, the Debtors created the world's first demand-side platform (DSP).  A DSP is a digital advertising platform where advertisers can manage their digital media investments.  The platform core function is to enable digital media buyers to buy data driven advertising placements in real time using advanced algorithms to match specific targeting criteria to available inventory from publishers worldwide.

9.      Advertisers upload their media buys via the Company's software platform.  Once the campaign is uploaded, the DSP searches through its network of publishers for sites and mobile apps that fit the advertiser's criteria and makes a bid for placement.  Thereafter, the DSP resolves the bid, places the ad, serves the ad and manages payment.

10.    From a handful of employees at its inception, the Company grew to a peak global operation with over 750 employees in locations around the world.  As a leading DSP, the Company managed more than 5,500 active advertisers at its peak and pioneered the use of consent-based, cross-device identifiers that promote trust, transparency, and accountability across the digital advertising supply chain.

11.    In addition to providing the DSP, the Company offered consulting experts to help clients engineer customized solutions around trading, analytics, technology integration, and business process automation to maximize returns on programmatic advertising investments.

12.    As explained more fully below, prior to the filing, the Debtors began winding down their platform and significantly reduced their workforce.

## II.    The Debtors' Equity Ownership and Capital Structure

### A.    Equity Ownership

13.    As reflected in the Org Chart, Debtor MediaMath Holdings, Inc., a corporation organized under the laws of the State of Delaware, owns 100% of the equity interests in operating Debtor, MediaMath, Inc.  MediaMath, Inc., in turn, owns 100% of the equity interests in Debtors Adroit DS, LLC and MediaMath Ventures, LLC, each of which is an inactive, non-operating company.   MediaMath, Inc. also owns interests in a number of foreign subsidiaries (collectively, the "**Non-Debtor Foreign Subsidiaries**"), none of which is a debtor in these Chapter 11 Cases.

14.    Debtors Searchlight MM Topco, L.P., Searchlight MM Topco GP, LLC and Searchlight MM Holdings, LLC, are non-operating holding companies with no assets or liabilities other than their equity interests in the Debtor subsidiaries.

**B.**       **Capital Structure**[2]

15.       As of the Petition Date, the Debtors  had approximately $94,960,749.33 million of aggregate principal first lien funded indebtedness, including accrued and unpaid interest, under that certain Amended and Restated Credit and Guaranty Agreement, dated as of April 21, 2022, by and among Debtor MediaMath Holdings, Inc. ("**Parent**") and certain subsidiaries of the Debtors, as guarantors, the other credit parties party thereto from time to time, the lenders party thereto from time to time, and Goldman Sachs Specialty Lending Group, L.P. (the "**First Lien Agent**"), as administrative agent and collateral agent, that provides for a total facility of $91,116,816.67 (as amended, restated, modified, or supplemented from time to time, the "**First Lien Financing Agreement**").

16.       The First Lien Financing Agreement, which memorializes the terms of the Debtors' first lien funded indebtedness, is made up of a $11,116,816.67 term loan and a revolving facility in an aggregate amount not to exceed $80,000,000.  As of the Petition Date, the Debtors had approximately $94,960,749.33 of aggregate principal first lien funded indebtedness, including accrued and unpaid interest.

17.       The Debtors also have a second lien tranche of debt pursuant to that certain Senior Secured Second Lien Term Loan Credit and Guaranty Agreement, dated as of April 21, 2022 (as amended from time to time, the "**Second Lien Financing Agreement**"), by and among the Debtors, Parent, and certain subsidiaries of Debtors, as guarantors, the other credit parties party thereto from time to time, the lenders party thereto from time to time, and Wilmington Savings Fund Society, FSB, in its capacities as administrative agent and as collateral agent.

---

[2]       Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the applicable prepetition credit documents described herein.

18. The Second Lien Financing Agreement provides for a $54,877,628.60 second lien tranche, and as of the Petition Date, the Debtors had approximately $70,074,193 of aggregate principal second lien funded indebtedness, including accrued and unpaid interest.

19. The Table below summarizes the Debtors' prepetition capital structure.

| Indebtedness | Balance Outstanding as of Petition Date |
|---|---|
| **First Lien** | $94,960,749.33 |
| **Second Lien** | $70,074,193.00 |
| **Total Funded Indebtedness** | $165,034,942.33 |

20. As of the Petition Date, the Debtors' books and records list approximately $125 million in outstanding trade liabilities.

**III.    Circumstances Leading to these Chapter 11 Cases; Chapter 11 Objectives**

**A.    The Debtors' Business Is Continuing to Face a Number of Significant Challenges**

21. Competition in the marketing services industry is robust and the advertising market itself has been in decline. Despite being the first DSP in the advertising space, the Debtors have struggled to achieve the scale they need in order to be cash-flow positive. Mounting liquidity challenges and pressures resulted from a negative working capital build-up, coupled with the Debtors' lease obligations at 4 World Trade Center (the "**Lease Obligations**").

22. Beginning in June of 2021, the Company began engaging with advisors in order to assess potential strategic alternatives, including a sale to a strategic third-party buyer and a prepackaged chapter 11 proceeding to facilitate the shedding of the Lease Obligations. Ultimately, after months of negotiations between Searchlight Capital Partners ("**SCP**"), who at the time owned 100% of the Series D Preferred Stock, secured lenders First Lien Agent and Santander,

and other equity holders, the Debtors consummated a recapitalization transaction (the "**Recapitalization**") whereby SCP and other equity holders committed to invest up to $150 million in the form of new money and a refinancing of existing debt.  Through the Recapitalization, an affiliate of SCP merged into MediaMath Holdings, Inc., thereby resulting in an affiliate of SCP, Searchlight MM Topco owning 100% of the equity interests in MediaMath, Inc.

> B.    **Despite Significant and Prolonged Efforts, the Debtors Have Been Unable to Successfully Restructure Out of Court**

23.    Despite the infusion of capital afforded by the Recapitalization, in early 2023, the Debtors once again began to experience the strain of continued liquidity pressures.  As a result, various payment defaults and other "Events of Default" continued to accrue under the First Lien Financing Agreement, though First Lien Agent declined to exercise any remedies available to it in order to facilitate a consensual transaction or restructuring.  The Debtors engaged advisors Latham & Watkins LLP, as counsel, FTI Consulting as financial advisor, and Houlihan Lokey ("**Houlihan**") as investment banker.  Before concluding that commencing these Chapter 11 Cases was the only viable path, the Debtors explored a number of potential out-of-court transactions, including both a sale transaction led by Houlihan and a potential investment of additional capital.  The Debtors received several proposals, including (i) for an investment in the Debtors' common equity and (ii) for a partial paydown of the first lien indebtedness and additional working capital.  Ultimately, none of these proposals were feasible.

24.    Simultaneously, in connection with the sale efforts, Houlihan contacted a broad group of 29 prospective purchasers, of which 26 engaged in initial discussions, 14 conducted further detailed diligence pursuant to non-disclosure agreements, and received access to a virtual data-room to facilitate such analysis, and three of which provided final letters of interest.  The Debtors ultimately pursued the proposal from a third party purchaser (the "**Buyer**") who submitted

a bid in May 2023 to purchase 100% of the share capital of Searchlight MM Holdings, LLC for up to $70 million, based on a $50 million fixed payment in cash and up to $20 million in additional consideration structured as an earn-out and subject to achievement of certain performance hurdles through 2024.

25.    Over the course of the next several weeks and in subsequent rounds of negotiation, the Buyer lowered the purchase price and the parties discussed several alternative structures – for both out-of-court sale transactions as well as in-court sales through section 363 of the Bankruptcy Code – in order to facilitate the Debtors to continue as a going concern.  Finally, the parties believed that they had reached an agreement, pursuant to which the First Lien Agent would accept less than payment in full on account of the first lien funded indebtedness, and the sale would close on or before July 3, 2023.  However, on June 24, 2023 – the date upon which the binding purchase agreement was to be executed – the board of the Buyer voted against the sale. Though First Lien Agent and the Debtors continued to communicate with the Buyer for nearly a week to explore the possibility of a transaction, the parties were unable to reach an agreement. Thus, the Debtors were left with no viable alternatives for either in-court or out-of-court financings or going-concern sales.

C.    **The Board Determined that, Given the Debtors' Mounting Liquidity Concerns, the Only Viable Path Forward to Preserve the Value of the Debtors' Business and Assets Is a Chapter 11 Filing**

26.    After months of restructuring efforts, and after carefully considering, among other things, the Debtors' cash position and the increasing liquidity strain, the members of the Board determined that the only viable path to preserving and maximizing the value of the Debtors' assets was to commence these Chapter 11 Cases.

27.     Despite their prepetition marketing efforts, the Debtors were unable to identify an actionable transaction for the business.  The Company's cash burn at full operation was unsustainable and the Debtors had no go-forward financing options.  Accordingly, prior to the Petition Date, the Debtors began winding down the platform, significantly reduced employee headcount, and began to wind-down the Non-Debtor Foreign Subsidiaries.  The Debtors will maintain a team to assist with the partial or substantially complete wind-down of the business through these Chapter 11 Cases, which will include collection of outstanding accounts receivables.

## IV.     First Day Pleadings[3]

### A.     Facts In Support of First Day Motions

28.     To enable the Debtors to operate effectively and to avoid the adverse effects of these Chapter 11 Cases, the Debtors have filed the motions and applications described below.

29.     In connection with the preparation for the commencement of these Chapter 11 Cases, I reviewed each of the First Day Pleadings referenced below.  The First Day Pleadings were prepared with my input and assistance, or the input and assistance of employees or other representatives of the Debtors working under my supervision.  I believe the information contained in the First Day Pleadings is accurate and correct.  As set forth more fully below, I believe that the entry of orders granting the relief requested in these motions and applications is critical to the Debtors' ability to preserve the value of their estates, assist in their chapter 11 efforts, and avoid any unanticipated interruption to their business operations that might otherwise be caused by the commencement of these Chapter 11 Cases.  Absent the relief requested in the First Day Motions, I believe that the Debtors would suffer immediate and irreparable harm.

---

[3]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the applicable First Day Pleading.

**B.**  **Administrative First Day Motions**

    *i.*  *Motion of Debtors for Entry of an Order Authorizing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion")*

30.  The Debtors seek the joint administration of these Chapter 11 Cases for procedural purposes only.  I believe that it would be far more practical and expedient for the administration of these Chapter 11 Cases if the Court were to authorize their joint administration. Joint administration will reduce costs and facilitate the administrative process by avoiding the need for duplicative notices, applications and orders.  It is my understanding that no prejudice will befall any party by the joint administration of the Debtors' cases, as the relief sought therein is solely procedural, and not intended to affect substantive rights.

    *ii.*  *Debtors' Application for Entry of an Order Appointing Epiq Corporate Restructuring, LLC as Claims And Noticing Agent Effective As Of The Petition Date (the "Epiq Retention Application")*

31.  The Debtors request entry of an order, pursuant to section 156(c) of title 28 of the United States Code and Local Rule 2002-1(f), authorizing the retention and appointment of Epiq Corporate Restructuring, LLC ("**Epiq**") as claims and noticing agent in these Chapter 11 Cases.  I believe that the relief requested in the Epiq Retention Application will ease the administrative burden on the Clerk of the Court in connection with the prosecution of these Chapter 11 Cases.  In addition, I have been advised by counsel that Epiq's retention is required by the Local Rules in light of the anticipated number of creditors in these Chapter 11 Cases.

32.  Therefore, on behalf of the Debtors, I respectfully request that the Epiq Retention Application be approved.

    *iii.*  *Debtors' Motion for Entry of Order (I) Authorizing Redaction of Certain Personal Identification Information from the Creditor Matrix and Other Documents, and (III) Granting Related Relief (the "Creditor Matrix Motion")*

33.     The Debtors request entry of an order authorizing redaction of certain personally identifiable information of the Debtors' individual creditors and interest holders in the Creditor Matrix and other documents filed in these Chapter 11 Cases.

34.     As detailed in the Creditor Matrix Motion, the Debtors request authority to file under seal and redact portions of its creditor matrix and certain other documents filed in these Chapter 11 Cases.   I understand that the information the Debtors seek to redact consists of confidential personally identifiable information, including the personal addresses of individual creditors and other parties in interest.   I believe that redacting such personally identifiable information and interest holders is warranted because the disclosure of such information would (a) create an undue risk of identity theft contemplated by section 107(c) of the Bankruptcy Code, and (b) potentially cause other types of unlawful injury to these individuals, including potential future harassment from the Debtors' other creditors.

35.     Moreover, in certain jurisdictions in which the Debtors operate, the Debtors are subject to various privacy laws and statutes, as detailed more fully in the Creditor Matrix Motion, the violation of which could subject the Debtors and their estates to regulatory actions, severe penalties, and liability.

36.     Accordingly, I believe the Debtors' request to seal the creditor matrix is both necessary and appropriate to allow the Debtors' to successfully prosecute these chapter 11 cases and to protect the personally identifiable information of individual creditors and other parties in interest.

37.     Based on the foregoing, and those additional reasons set forth in the Creditor Matrix Motion, I believe that the relief requested in the Creditor Matrix Motion is both necessary and appropriate to allow the protection of the personally identifiable information of the Debtors'

30498607.11

creditors and other parties in interest.  Accordingly, I respectfully ask the Court to grant the relief requested in the Creditor Matrix Motion.

      **C.**     **Operational First Day Motions**

         *i.*     *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(A), 363, and 364 of the Bankruptcy Code, (I) Authorizing Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection With Insurance Programs, Including Payment of Policy Premiums and Broker Fees, (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (III) Scheduling a Final Hearing (the "Insurance Motion")*

      38.     The Debtors request authority to continue and, to the extent necessary, renew the Insurance Programs and pay policy premiums, and Broker Fees arising thereunder or in connection therewith, including such prepetition obligations arising in the ordinary course of business.

      39.     In connection with the operation of their business, the Debtors maintain, among others, insurance programs for directors and officers, employment practices and fiduciary liability, general liability, automobile, cyber, workers' compensation, and umbrella and excess liability (collectively, the "**Insurance Programs**").  Continuation of the Insurance Programs is essential for preserving the value of the Debtors' assets and, in most cases, such coverage is required by the various contracts and laws that govern the Debtors.  Furthermore, it is my understanding that, pursuant to the chapter 11 operating guidelines issued by the United States Trustee for Region 3 pursuant to 28 U.S.C. § 586, the Debtors are obligated to maintain certain insurance coverage, which coverage is provided by the policies included in the Insurance Programs.

      40.     Similarly, the services provided by the Broker are critical to ensuring that the Debtors obtain the necessary insurance coverage on advantageous terms at competitive rates,

and the Brokers have a significant amount of institutional knowledge regarding the Debtors' insurance needs. If the Debtors were forced to replace the Brokers, the Debtors would necessarily be required to spend time, energy and resources getting a new insurance broker up to speed on the Debtors' insurance needs.

41.    Accordingly, on behalf of the Debtors, I respectfully request that the Insurance Motion be approved.

ii.    *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(A), 363(B), 507(A)(8), 541, 1107(A), And 1108 of the Bankruptcy Code, (A) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations, (B) Authorizing Banks to Honor and Process Check And Electronic Transfer Requests Related Thereto, and (C) Scheduling a Final Hearing (the "Taxes Motion")*

42.    The Debtors request authority to pay certain prepetition taxes and fees that, in the ordinary course of business, accrued or arose before the Petition Date. In the ordinary course of business, the Debtors incur or collect certain Taxes and Fees and remit such Taxes and Fees to various Authorities in accordance with applicable law. Any failure to pay the Taxes and Fees could impair the Debtors' ability to continue their business operations. Any unexpected or inopportune interruption of the Debtors' operations during the course of these Chapter 11 Cases could diminish estate value and frustrate the Debtors' chapter 11 efforts. In addition, certain of the Authorities may take precipitous action against the Debtors' directors and officers for certain unpaid Taxes and Fees that undoubtedly would distract those individuals from their duties related to the Debtors' prosecution of these Chapter 11 Cases. Finally, based on my knowledge and conversations with the Debtors' professional advisors, it is my understanding that certain of the Taxes and Fees are entitled to priority status under the Bankruptcy Code and, as a result, must be paid in full before any general unsecured obligations may be satisfied.

43.    Accordingly, on behalf of the Debtors, I respectfully request that the Taxes and Fees Motion be approved.

     *iii.*    *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (A) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (B) Deeming Utility Companies Adequately Assured of Future Payment, (C) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (D) Setting a Final Hearing Related Thereto (the "Utilities Motion")*

44.    Through the Utilities Motion, the Debtors request the entry of interim and final orders, among other things:  (a) prohibiting the Utility Companies from altering, refusing, or discontinuing Utility Services on account of prepetition invoices, including the making of demands for security deposits or accelerated payment terms; (b) deeming the Utility Companies adequately assured of future payment; (c) establishing procedures for determining additional adequate assurance of future payment and authorizing the Debtors to provide additional adequate assurance of future payment to the Utility Companies; and (d) setting a final hearing related to the relief requested in the Utilities Motion.

45.    The Utility Companies provide the Debtors with internet connectivity services.  The Debtors could not operate their business or serve their customers in the absence of continuous Utility Services.  Thus, any interruption in such services would disrupt the Debtors' day-to-day operations and be incredibly harmful to their business.

46.    In general, the Debtors have established a good payment history with the Utility Companies, making payments on a regular and timely basis.  To provide adequate assurance to the Utility Companies, as required under section 366 of the Bankruptcy Code, the Debtors propose to deposit a sum of $8,813.82 which represents 50% of the Debtors' estimated monthly cost of Utility Services subsequent to the Petition Date, into a segregated account to be maintained during the pendency of these Chapter 11 Cases in the manner provided for in the Proposed Orders.

47.     I believe and am advised that the Assurance Procedures are necessary, because if such procedures were not approved, the Debtors could be forced to address numerous additional adequate assurance requests by the Utility Companies in a disorganized manner during the critical first weeks of these Chapter 11 Cases.  Moreover, a Utility Company could unilaterally determine, on or after the 30th day following the Petition Date, that it is not adequately assured of future payment and discontinuing service or making an exorbitant demand for payment to continue service.

48.     Accordingly, on behalf of the Debtors, I respectfully request that the Utilities Motion be approved.

> iv.    *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 345, 363, 1107(a), and 1108 of the Bankruptcy Code, Bankruptcy Rule 2015, and Local Rule 2015-2, (I) Authorizing and Approving Continued Use of Cash Management System, (II) Authorizing Use of Prepetition Bank Accounts and Business Forms, (III) Waiving the Requirements of Section 345(b) on an Interim Basis, and (IV) Granting Certain Related Relief (the "Cash Management Motion")*

49.     Through the Cash Management Motion, the Debtors request:  (a) approval of the continued use of the existing cash management system; (b) granting the Debtors a waiver of certain bank account and related requirements of the Office of the United States Trustee for the District of Delaware to the extent that such requirements are inconsistent with (i) the Debtors' practices in connection with their existing cash management system, or (ii) any action taken by the Debtors in accordance with any order granting the relief requested in this Motion or any other order entered in these Chapter 11 Cases; and (c) waiving the requirements of section 345(b) of the Bankruptcy Code with respect to the Debtors' deposit practices on an interim basis.

50.     In the ordinary course of business, the Debtors utilize a central cash management system to collect, transfer, and disburse funds generated by their operations

(the "**Cash Management System**").   It is critical that the Debtors be able to consolidate management of cash and centrally coordinate transfers of such funds to operate their business efficiently and effectively.  Any disruption to the Cash Management System would seriously harm the Debtors.  Maintenance of the existing Cash Management System will prevent any unexpected or inopportune interruption to the Debtors' business operations while protecting the Debtors' cash for the benefit of their estates.  Requiring the Debtors to change their Cash Management System at this critical time would, among other things, cause unnecessary disruption to the Debtors and their business affairs.

51.    The Cash Management System provides significant benefits to the Debtors, including the ability to:  (a) closely track, and thus control, all corporate funds; (b) ensure cash availability; and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information.  A disruption in the Cash Management System could cause delays in the collection and disbursement of funds, thus impeding the Debtors' ability to avoid an unexpected or inopportune interruption in their operations during the pendency of these Chapter 11 Cases.

52.    The Debtors' Chapter 11 Cases will be facilitated by preserving the "business as usual" atmosphere, and avoiding the distractions that would inevitably be associated with a substantial disruption in the Cash Management System.  Furthermore, if enforced, the U.S. Trustee Guidelines would cause enormous disruption to the Debtors' business and would impair the Debtors' chapter 11 efforts.  I believe that maintaining the Bank Accounts is necessary to avoid delays in paying debts incurred postpetition, and to ensure as smooth a transition into chapter 11 as possible.   If the Debtors are required to transfer their existing Bank Accounts, it will be

disruptive, time consuming, and expensive.  Likewise, it would be costly and disruptive to require the Debtors to begin using new stationary and business forms.

53.    Accordingly, on behalf of the Debtors, I respectfully request that the Cash Management Motion be approved.

> v.    *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 507(a)(4), and 507(a)(5) of the Bankruptcy Code, (A) Authorizing (I) Payment of Prepetition Employee Wages, Salaries, and Other Compensation; (II) Payment of Accrued Prepetition Obligations Owed to Independent Contractors; (III) Payment of Prepetition Employee Business Expenses; (IV) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (V) Payments for Which Prepetition Payroll Deductions Were Made; (VI) Payment of All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (VII) Payment to Third Parties of All Amounts Incident to the Foregoing Payments and Contributions; and (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto (the "Employee Wages Motion")*

54.    Through the Employee Wages Motion, the Debtors request authority to, in accordance with their stated policies:  (a) pay accrued prepetition Employee wages, salaries, and other compensation; (b) pay accrued prepetition Independent Contractor obligations; (c) pay prepetition employee business expenses; (d) make contributions to prepetition benefit programs provided to the Employees, the most significant of which are described below, and continue such programs in the ordinary course of business with respect to the Employees; (e) make payments for which prepetition payroll deductions were made; (f) pay processing costs and administrative expenses relating to the foregoing payments and contributions; and (g) make payments to third parties incident to the foregoing payments and contributions (collectively, and as described in greater detail below and in the Employee Wages Motion, the "**Employee Wages and Benefits**").

55.    Prior to the Petition Date, the Debtors employed approximately 192 Employees (as defined below).  However, shortly before the Petition Date, the Debtors partially ceased operations and significantly reduced their headcount.

56.    As of the Petition Date, the Debtors' workforce comprises of approximately eleven (11) full-time, salaried employees (the "**Employees**").

57.    In addition, the Debtors supplement their workforce by retaining from time to time individuals and vendors with specialized expertise as independent contractors (the "**Independent Contractors**," and together with the Employees, the "**Workforce**").  The number of Independent Contractors employed by the Debtors at any given time fluctuates depending on the Debtors' business needs but, as of the Petition Date, the Debtors employed ten (10) Independent Contractors.  The Independent Contractors fill immediate business needs of the Debtors and allow the Debtors to have a flexible Workforce to meet their operational needs in a cost-effective manner.

58.    In the ordinary course of business, the Debtors maintain a variety of business practices, programs, and policies for their Employees.  The Debtors funded the majority of their payroll obligations before the Petition Date.  To the extent amounts are outstanding, the following table contains descriptions of the significant Employee Wages and Benefits programs, and the Debtors' estimates of the fees and expenses, including amounts owed to any third-party administrators, incident to the Employee Wages and Benefits obligations that have accrued but remain unpaid as of the Petition Date:

| **Employee Wages and Benefits** | **Aggregate Amount** |
| --- | --- |
| Unpaid Wages | $3,500 |
| Employee Expenses | $75,000 |

| Wage Deductions | $15,000 |
|---|---|
| Payroll Taxes | $0 |
| Health Benefits and COBRA | $ 350,000 |
| Paid Time Off | $0 |
| 401(k) Plan | $0 |
| Life and AD&D Insurance and Disability Benefits | $0 |

59.     The Debtors' ability to preserve the value of their assets and successfully conduct these Chapter 11 Cases depends on the continued expertise, enthusiasm and service of their Workforce.  Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the Debtors believe that the morale and performance of their Employees may be adversely affected.  If the Debtors fail to pay the Employee Wages and Benefits in the ordinary course, their Workforce will suffer personal hardship and, in some cases, may be unable to pay their basic living expenses.  This result would have a highly negative impact on workforce morale, and likely would result in unmanageable performance issues, thereby resulting in immediate and irreparable harm to the Debtors and their estates.

60.     Accordingly, on behalf of the Debtors, I respectfully request that the Employee Wage Motion be approved.

iii.     *Motion of Debtors for Orders Establishing Notification Procedures and Approving Restrictions on Certain Transfers of, or Worthlessness Deductions with Respect to, Stock of the Debtors (the "NOL Motion").*

61.     Pursuant to the NOL Motion, the Debtors seek entry of Interim and Final Orders establishing notice and hearing procedures that must be followed before certain transfers of, or certain claims of worthlessness for federal tax purposes with respect to, equity securities in

Debtors, or of any beneficial interest therein, are deemed effective. The proposed procedures are necessary to protect and preserve the value of the Debtors' U.S. federal tax attributes, including, but not limited to, significant net operating loss carryforwards ("**NOLs**" and, collectively with any capital losses, unrealized built-in losses, and certain other tax and business credits and other tax attributes, the ("**Tax Attributes**").

62.    As of the Petition Date, the Debtors believe they have approximately $225 million of federal NOLs (some of which are subject to certain limitations set forth under Title 26 of the United States Code (the "**Tax Code**")).  The Tax Attributes are a valuable asset because the Debtors generally can carry forward the Tax Attributes to reduce or eliminate its income tax liability, and any such savings could enhance the Debtors' cash position for the benefit of all parties in interest. Additionally, the Debtor can carry forward the NOLs and credits to reduce its future tax liability.

63.    If no restrictions on trading or claiming worthless stock deductions are imposed by the Court, such trading or deductions could severely limit or even eliminate the Debtors' ability to utilize the NOLs and other Tax Attributes, which could lead to significant negative consequences for the Debtors, their estate, creditors, and other stakeholders. Accordingly, based on the foregoing and as further set forth in the NOL Motion, I believe that the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors, their estates, creditors, and all other parties in interest.

    iv.    *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral; (B) Granting Adequate Protection; (C) Scheduling*

*a Final Hearing; and  (D) Granting Related Relief (the "Cash Collateral Motion")*

64.     To enable the Debtors to fund the administration of these Chapter 11 Cases, the Debtors, through their professional advisors, engaged in negotiations with the Prepetition Secured Parties regarding the consensual use of cash collateral to fund these Chapter 11 Cases.  It is essential to the Debtors' efforts to preserve and maximize the value of their assets that they obtain the authority to use the cash derived from operating the business (the "**Cash Collateral**"). The Debtors will use the Cash Collateral to fund certain operating expenses related to the Debtors' business operations and administrative fees related to these Chapter 11 Cases, subject to an approved budget (the "**Approved Budget**").  The Debtors believe that the use of Cash Collateral will be sufficient to fund their operations and the costs of these Chapter 11 Cases, without the need for debtor-in-possession financing.

65.     The reasons supporting the Debtors' need to use Cash Collateral during the course of these Chapter 11 Cases are compelling.  The use of Cash Collateral is required to fund the day-to-day operating expenses, including payments to employees and otherwise sustaining the value of the Debtors' businesses.  Unless the Court authorizes use of the Cash Collateral, the Debtors will be unable to pay for services and expenses necessary to preserve the value of the Debtors' assets.  Indeed, absent sufficient funds to support the Debtors' business operations, the value of the Debtors' assets will quickly erode.  Therefore, immediate authorization to use Cash Collateral in accordance with the Approved Budget is in the best interests of the Debtors' estates and creditors

66.     Through the Cash Collateral Motion, the Debtors intend to request entry of interim and final orders authorizing the Debtors' use of Cash Collateral and granting adequate protection to the Prepetition Secured Parties.  Importantly, the Debtors have obtained the consent

of the Prepetition Secured Parties to use Cash Collateral subject to the terms set forth in the Cash Collateral Motion and the Approved Budget, which will protect the Prepetition Secured Parties from any diminution in value.

67.     The Debtors require immediate access to liquidity to ensure they are able to continue operating their businesses during these Chapter 11 Cases and preserve the value of the estates for the benefit of all parties in interest.  However, without prompt access to Cash Collateral, the Debtors would be unable to, *inter alia*, satisfy trade payables incurred in the ordinary course of business, preserve the value of their estates, and fund the administration of these Chapter 11 Cases, which would cause immediate and irreparable harm to the value of the Debtors' estates, to the detriment of all stakeholders.

68.     The Debtors have reached an agreement with the Prepetition Secured Parties on an Approved Budget, which, subject to customary permitted variances and roll forwards, will set forth the amounts that the Debtors will be authorized to spend during the course of these Chapter 11 Cases.  I have worked closely with the Debtors' management and professional advisors to ensure that the Approved Budget includes those amounts that will be necessary to preserve and maximize the value of the Debtors' estates.  The Cash Collateral Motion only seeks authority to expend amounts in the Approved Budget during the period prior to a final hearing on the Motion that will avoid any immediate and irreparable harm to the Debtors and their businesses from a failure to have access to the goods and services used to operate the businesses.

69.     For the foregoing reasons, the Debtors' continued use of Cash Collateral is necessary to preserve the value of its estate and maximize its value for the benefit of all stakeholders.

70.     Accordingly, on behalf of the Debtors, I respectfully request that the Cash Collateral Motion be approved.

## <u>CONCLUSION</u>

71.    In conclusion, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each First Day Pleading be granted in its entirety, along with such other and further relief as the Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth herein, the foregoing is true and correct.

Executed: July 3, 2023

*/s/ Neil Nguyen*
Neil Nguyen
Chief Executive Officer

30498607.11

# **EXHIBIT 1**

## **Org Chart**

Borrower under the First and Second Lien Credit Agreements

Guarantor under the First and Second Lien Credit Agreements

# MediaMath Corporate Structure

Note: Ownership is 100% unless otherwise indicated.

*Note: Searchlight MM Topco GP is the non-economic general partner interest in Searchlight MM TopCo, L.P. and is sole general partner of Topco LP.